FILED

AUG - 5 2019

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

DAVID L. ANDERSON (CABN 149604)
United States Attorney

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

JULIE D. GARCIA (CABN 288624)
SAILAJA M. PAIDIPATY (NY5160007)
RYAN REZAEI (CABN 285133)
Assistant United States Attorneys

 450 Golden Gate Avenue, Box 36055
 San Francisco, CA 94102-3495
 Telephone: 415-436-7200
 Fax: 415-436-7234
 julie.garcia@usdoj.gov
 sailaja.paidipaty@usdoj.gov
 ryan.rezaei@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 19-71145 TSH |
| Plaintiff, | MEMORANDUM IN SUPPORT OF GOVERNMENT'S MOTION TO DETAIN DEFENDANT PENDING TRIAL |
| v. | |
| KAREN CASTRO-TORRES, | Hearing date: August 5, 2019, at 10:30 am |
| Defendant. |  |

MEMO. I/S/O GOVT'S MOT. TO DETAIN
19-71145 TSH

1

## I. INTRODUCTION

From at least early 2018 until her arrest last week, defendant Karen Castro-Torres was a lieutenant of a drug-trafficking organization (DTO) distributing pound and kilogram quantities of methamphetamine, heroin, and cocaine in at least the San Francisco Bay area and Seattle.

After her significant other and co-conspirator, Eduardo Viera-Chirinos ("Eduardo"[1])—the leader of the DTO—was caught driving kilograms of drugs to the Seattle area on July 22, 2019, Ms. Castro-Torres immediately began trying to obtain passports for their children so they could all flee the country. Her arrest on July 26, 2019, put an end to those plans.

But last month was not the first time Ms. Castro-Torres has tried to avoid prosecution. In 2014, she entered the United States without authorization, falsely claimed to be a minor, and was released to the custody of a relative. She then failed to appear at any future immigration proceedings.

Two years later, in 2016, Ms. Castro-Torres was arrested for distributing drugs—and in quantities that the arresting officers believed showed she was supplying street-level dealers. After being released on bail, she failed to appear at any future court dates, and a bench warrant was issued.

The next year, Ms. Castro-Torres was arrested on the bench warrant. She once again bailed out, and once again she failed to appear—leading to another bench warrant.

It was not until she was arrested a third time in 2018, in connection with the June 5, 2018, search warrants described in the complaint, that she pleaded no-contest to the 2016 charges and was sentenced to six months in jail and three years' probation.

Upon her release from jail later in 2018, Ms. Castro-Torres was transferred to the custody of U.S. Immigration and Customs Enforcement (ICE), which released her on the condition that she self-deport within a week. Rather than do that, Ms. Castro-Torres again absconded.

Due to the nature of the pending charge, the law presumes that no condition or combination of conditions can reasonably assure Ms. Castro-Torres's appearance as required or the safety of the community. Her actions show that the presumption is warranted. The government agrees with Pretrial Services that the Court should detain Ms. Castro pending trial.

---

[1] Many defendants in this case have the same or similar surnames. To avoid confusion, we refer to some of the defendants by their first names.

## II.  BACKGROUND

### A.  History and Characteristics of the Defendant

Ms. Castro-Torres entered the United States without authorization in approximately 2014. On August 30, 2014, U.S. Customs and Border Protection apprehended her near the U.S./Mexico border. Ms. Castro-Torres told CBP that she was from Honduras and that her parents lived in Tegucigalpa. She further stated that she was born on February 25, 1998, and that she was therefore 16 years old. As a result, Ms. Castro-Torres was treated as an unaccompanied minor, served with a notice to appear, and released to a family member in the Los Angeles area.

Following her release, Ms. Castro-Torres never appeared in court. On February 12, 2015, she was ordered removed in absentia; records checks showed that she was not in custody at the time.

Slightly over a year later, on May 15, 2016, law enforcement officers executed a search warrant in Oakland and found Ms. Castro-Torres and several other individuals inside. Ms. Castro-Torres was holding a purse, inside which the officers found numerous individually wrapped chunks of cocaine base, bindles of powder cocaine, baggies of methamphetamine, baggies of black-tar heroin, and baggies of heroin.

In connection with that search, Ms. Castro-Torres was arrested for possession of narcotics with the intent to distribute. A few days later, she was released on bail; however, according to SFPD Officer Brenton Reeder, one of the investigating officers, Ms. Castro-Torres never appeared to face these charges, and a bench warrant was issued.

On August 13, 2017, Ms. Castro-Torres was arrested on the bench warrant in Santa Clara County. She spent four days in jail before being released on bail. Court documents show that Ms. Castro-Torres then missed the next three court dates, and a bench warrant was issued again.

On June 5, 2018, as set out in the complaint, Ms. Castro-Torres was once again arrested for possessing narcotics with the intent to distribute after officers found several pounds of methamphetamine, heroin, and cocaine in an apartment she had rented under the alias "Delany Cardona." Some of these drugs were found inside an air compressor with a secret compartment. The secret compartment also contained a pay/owe sheet listing, among other names, the name "Karen."

Upon her arrest, Ms. Castro-Torres was brought before the Alameda County Superior Court to

MEMO. I/S/O GOVT'S MOT. TO DETAIN         3
19-71145 TSH

face the charges arising from the 2016 arrest (when she had had drugs in her purse). Ms. Castro-Torres entered a no-contest plea and was sentenced to six months in jail and three years' probation.

On August 29, 2018, Ms. Castro-Torres was released from the Alameda County jail into the custody of Immigration and Customs Enforcement (ICE) in connection with the deportation order that had been issued in 2015. The officers asked whether Ms. Castro-Torres had any medical issues, and she said she was six months pregnant. According to ICE Agent Jeff Castro, due to the pregnancy ICE did not immediately deport Ms. Castro; rather, ICE released Ms. Castro on the condition that she self-deport within one week and, in the interim, be subject to telephonic monitoring.

Ms. Castro-Torres never called ICE as required. Eventually, Ms. Castro-Torres's relative "Ana" called ICE and said that Ms. Castro-Torres had purchased a ticket to Honduras for September 7th. ICE agents went to the airport to confirm that Ms. Castro-Torres boarded the plane; however, she never appeared.

Ms. Castro-Torres was still on state probation when, on July 26, 2019, she was arrested on the current charges.

When Ms. Castro-Torres appeared in this Court for her arraignment, she stated that she was 24, consistent with the birthdate she provided to Pretrial Services. Based on that age and birthdate, Ms. Castro-Torres was 19 years old when she crossed the border into the United States in 2014—not a minor, as she had represented to Customs and Border Protection.

Ms. Castro-Torres also told Pretrial Services that two of her children live in Seattle and that a third lives in Honduras. Her parents, with whom she maintains frequent contact, also live in Honduras. Ms. Castro-Torres also said she has a Honduran passport.

**B.    Nature and Circumstances of the Offense**

As set out in more detail in the complaint, Ms. Castro-Torres worked with Eduardo and several of his relatives to manage a DTO active in the San Francisco Bay area and the Seattle area. Among other things, Ms. Castro-Torres helped coordinate the "redistributor houses" the DTO used to house street-level drug dealers whom it supplied, and the calls set out in the Complaint show that she knew those individuals were drug dealers.

On July 17th and 18th, 2019, as described in the Complaint, Ms. Castro-Torres traveled to Los

Angeles with Eduardo to pick up a large quantity of drugs and transport them back to the Bay Area using a hidden compartment in their car.

On July 22, 2019, authorities seized a truck that Eduardo and another associate were driving to Seattle and found inside it several large packages of suspected heroin and cocaine. The packages that have been drug tested so far contained more than a kilogram of heroin and a kilogram of cocaine.

Immediately after the seizure, Eduardo called his and Karen's associate Enrique and said, "We are fucked. We are fucked." Eduardo, Karen, Enrique, and other associates then had several other calls on which, based on context, they appear to have been wondering whether authorities had found the drugs in the truck yet and whether Eduardo should or would flee to Canada.

A few days after the seizure, Karen spoke with Eduardo and an unknown woman about getting passports for her and Eduardo's children, as well as plane tickets. Based on the country code for the woman's phone (+504), agents believe the woman was in Honduras. Eduardo, Karen, and the woman in Honduras discussed how, if they purchased "tickets" –apparently a reference to plane tickets—they could obtain the passports more quickly, because the impending flight would be considered an "emergency." A transcript of the call follows, and the key portions are bolded:

| NAME | TRANSLATION[2] |
|---|---|
|  | **[Beginning of call]** |
| CASTRO-TORRES | Hello? |
| UF6684 | Hello. |
| CASTRO-TORRES | Um-hum? |
| UF6684 | Uh… sister-in-law, Ada [PH] said, said that… Right now she is going…. Because the date was not given… |
|  | [Voices overlap] |
| CASTRO-TORRES | Um-hum. |

---

[2] This call was originally in Spanish. Some words were difficult for monitors to make out due to the parties speaking over each other or poor audio quality. This transcript is a preliminary English translation that may be revised in the future.

MEMO. I/S/O GOVT'S MOT. TO DETAIN  5
19-71145 TSH

| | | |
|---|---|---|
| 1 | UF6684 | ...[U/I] but she was not told which date. So then, right now, she is going to talk to him to see what date to confirm it, and that way, [U/I]. [U/I] told me to wait a little bit until the guy answers her and verifies. |
| 4 | CASTRO-TORRES | Oh, that's good. |
| 5 | UF6684 | Yes... so then, as soon as she calls me, I'll [Pause]... |
| 6 | CASTRO-TORRES | Uh... |
| 7 | | [Voices overlap] |
| 8 | UF6684 | ...let you know. |
| 9 | CASTRO-TORRES | I [U/I] Eduardo's and that is it. |
| 10 | UF6684 | All right, then. |
| 11 | CASTRO-TORRES | Bye. |
| 12 | EDUARDO | What's up? |
| 13 | UF6684 | Hey! |
| 14 | EDUARDO | What's up? |
| 15 | | [Voices overlap] |
| 16 | UF6684 | [U/I]. |
| 17 | EDUARDO | Nothing. |
| 18 | UF6684 | What's up? Nothing. Ada said, said that, that, that right now she is going to ask the guy the date... |
| 20 | EDUARDO | Um-hum. |
| 21 | UF6684 | ...to see what date... what day it will be because if it is going to be this upcoming week, [Long pause] [U/I] until the thirtieth (30). |
| 23 | EDUARDO | But... |
| 24 | | [Voices overlap] |
| 25 | UF6684 | [U/I]. |
| 26 | EDUARDO | ...but, um-hum, you can do that with a reservation, but in order to do that, **I have to send for some papers that I left in Washington, and** |

| | | |
|---|---|---|
| 1 | | then I can give Karen authorization so she can take out a passport |
| 2 | | without me. So she can get the boy's passport. |
| 3 | UF6684 | Um-hum. |
| 4 | EDUARDO | We need to get that first. |
| 5 | UF6684 | So then, so then, so then, **I will talk Ada so that [U/I] can be done** |
| 6 | | **[U/I], because she [U/I] because the ticket's price for her is one-** |
| 7 | | **thousand two-hundred (1,200).** |
| 8 | EDUARDO | Um-hum. |
| 9 | UF6684 | **The little girl will cost you six-hundred (600) but… hers would be** |
| 10 | | **one-thousand two-hundred (1,200). So then, fifteen (15) days, more** |
| 11 | | **or less [Pause]. What do you think about fifteen (15) days?** |
| 12 | EDUARDO | Hello? |
| 13 | UF6684 | [U/I]? |
| 14 | EDUARDO | What did you say? |
| 15 | UF6684 | **That, that fifteen (15) days… what do you think?** |
| 16 | EDUARDO | **I think yes, that's fine.** |
| 17 | UF6684 | Oh, good, so then, I will call her and tell her that in about fifteen (15) |
| 18 | | days. |
| 19 | EDUARDO | Yeah, so… like try to… find something comfortable for, for a couple of |
| 20 | | days, so they can have a chance to take out [U/I]… because with, with, |
| 21 | | **with the ticket in hand, the, the passport can be obtained right away** |
| 22 | | **as an emergency.** |
| 23 | UF6684 | Oh, all right, then. |
| 24 | EDUARDO | **Um-hum, talk to Karen [U/I]…** |
| 25 | | [Voices overlap] |
| 26 | UF6684 | [U/I] send Karen… |
| 27 | | [Voices overlap] |
| 28 | | |

MEMO. I/S/O GOVT'S MOT. TO DETAIN           7
19-71145 TSH

| | | |
|---|---|---|
| 1 | EDUARDO | ...come to an agreement with Karen. |
| 2 | UF6684 | Look, I am going to send Karen the account to...because I am going get an apartment [U/I] the guy that you told me to give to? And I will put it directly [U/I]... |
| 5 | | [Voices overlap] |
| 6 | EDUARDO | Which one? |
| 7 | | [Voices overlap] |
| 8 | UF6684 | ...account [U/I]. The one for, for Jorgito's apartments. |
| 9 | EDUARDO | That money from there? |
| 10 | UF6684 | Yes, I am telling you Jorgito's apartments. |
| 11 | EDUARDO | Uh... to buy an apartment [U/I] the guy gave money? |
| 12 | UF6684 | No, that guy's... the three-thousand (3,000) bucks. |
| 13 | EDUARDO | Oh, all right, then, yeah. I, I, I, I, I... |
| 14 | | [Voices overlap] |
| 15 | UF6684 | So that [U/I]... |
| 16 | EDUARDO | ...I will reimburse you. Huh? What? |
| 17 | UF6684 | Yeah, so that, that, that you can put it, put it directly into the account. |
| 18 | EDUARDO | All right, then. That's fine. |
| 19 | UF6684 | All right, then. |
| 20 | EDUARDO | All, right, then. Once I am in a place, once I am done driving, and I am at the beach, I will call to talk to mom and all... Is mom okay? [U/I] |
| 22 | | [Voices overlap] |
| 23 | UF6684 | All right, then. Yes, but she is worried because you do not answer the phone. |
| 25 | EDUARDO | **It's because I don't have that number anymore, Norma [PH] and, and I will send you... I am going to call you to, so that you, so that** |

| | | |
|---|---|---|
| 1 | | **you can go buy a number, so that only we can communicate because** |
| 2 | | **the other ones are dirty. [U/I] is what I am saying.** |
| 3 | | [Voices overlap] |
| 4 | UF6684 | [U/I] |
| 5 | | [Voices overlap] |
| 6 | EDUARDO | All right, then. |
| 7 | | [Voices overlap] |
| 8 | UF6684 | [U/I] |
| 9 | | [Voices overlap] |
| 10 | EDUARDO | That is why I don't want to talk. All right, then. |
| 11 | UF6684 | [U/I]. |
| 12 | CASTRO-TORRES | Hello? |
| 13 | UF6684 | Hello [U/I]. |
| 14 | CASTRO-TORRES | Um-hum. |
| 15 | UF6684 | Look, uh… [U/I]… |
| 16 | | [Voices overlap] |
| 17 | CASTRO-TORRES | That you, that you [U/I]… |
| 18 | | [Voices overlap] |
| 19 | UF6684 | [U/I] |
| 20 | | [Voices overlap] |
| 21 | CASTRO-TORRES | [U/I] |
| 22 | | [Voices overlap] |
| 23 | UF6684 | …at least about fifteen (15) days. |
| 24 | CASTRO-TORRES | What did you say? |
| 25 | UF6684 | Fifteen (15) days, more or less. |
| 26 | CASTRO-TORRES | Yes, that's fine. |
| 27 | UF6684 | It will take about fifteen (15) days to do the paperwork. |

| | | |
|---|---|---|
| 1 | CASTRO-TORRES | Yeah, what happened is… Look, I already have all the papers, I already filled out the application for the passport. What happened is that I would constantly tell Eduardo… |
| 2 | | [Voices overlap] |
| 3 | UF6684 | Um-hum… |
| 4 | | [Voices overlap] |
| 5 | CASTRO-TORRES | …and every time, something would happen. If it wasn't one thing, it was another, but it's been a while that I have wanted to get the passport. I already have everything, everything. |
| 6 | UF6684 | Um-hum. |
| 7 | CASTRO-TORRES | So then, I was going to get it the normal way… |
| 8 | | [Voices overlap] |
| 9 | UF6684 | Um-hum… |
| 10 | | [Voices overlap] |
| 11 | CASTRO-TORRES | …so that it could be given back to me in a month or however long it takes, four (4) weeks or three (3), but when… |
| 12 | | [Voices overlap] |
| 13 | UF6684 | But? |
| 14 | | [Voices overlap] |
| 15 | CASTRO-TORRES | … I was with [U/I], the girl... |
| 16 | | [Voices overlap] |
| 17 | UF6684 | Um-hum… |
| 18 | | [Voices overlap] |
| 19 | CASTRO-TORRES | …I remember that she got it that way. That she went there to the office and told them that she needed it quickly, and they asked her why she needed it quickly, and she said, "Oh, it's because I am going |

| | | |
|---|---|---|
| 1 | | to travel." they said, "Look, if you're going to travel, bring the ticket |
| 2 | | and either the same day or the next day, you will get it… |
| 3 | | [Voices overlap] |
| 4 | UF6684 | [U/I] |
| 5 | | [Voices overlap] |
| 6 | CASTRO-TORRES | …but if you bring the ticket." |
| 7 | | [Voices overlap] |
| 8 | UF6684 | So then… |
| 9 | | [Voices overlap] |
| 10 | CASTRO-TORRES | …um-hum, as an emergency. |
| 11 | UF6684 | So then, what [U/I] I [U/I]… |
| 12 | | [Voices overlap] |
| 13 | CASTRO-TORRES | I… |
| 14 | | [Voices overlap] |
| 15 | UF6684 | …[U/I] it can be done in a week. |
| 16 | | [Voices overlap] |
| 17 | CASTRO-TORRES | Exactly, yes, because on Monday, I think, I think that… |
| 18 | | [Voices overlap] |
| 19 | UF6684 | [U/I] |
| 20 | | [Voices overlap] |
| 21 | CASTRO-TORRES | …Monday or Tuesday… like on Wednesday, I, I will have all the paperwork. |
| 23 | | [Voices overlap] |
| 24 | UF6684 | That's the good thing… |
| 25 | | [Voices overlap] |
| 26 | CASTRO-TORRES | Um-hum… |
| 27 | | [Voices overlap] |

MEMO. I/S/O GOVT'S MOT. TO DETAIN          11
19-71145 TSH

| | | |
|---|---|---|
| 1 | UF6684 | ….it's the least of it. |
| 2 | CASTRO-TORRES | Yeah, I say that from this week to the next… |
| 3 | | [Voices overlap] |
| 4 | UF6684 | So then, because… |
| 5 | | [Voices overlap] |
| 6 | CASTRO-TORRES | [U/I] |
| 7 | | [Voices overlap] |
| 8 | UF6684 | …she told me that like on the third (3rd), more or less. |
| 9 | CASTRO-TORRES | Like the third (3rd)? |
| 10 | UF6684 | Yeah, more or less. |
| 11 | CASTRO-TORRES | Um-hum, but she comes over here on the third (3rd), right? [U/I] **I am going to buy the girls… the kids for over there. For the date [U/I]…** |
| 12 | | [Voices overlap] |
| 13 | UF6684 | No, it's because **she is going to buy it from here.** She is going to buy it from here. |
| 14 | CASTRO-TORRES | Oh, yes, yes, yes. That's good. |
| 15 | UF6684 | **She told me that the little girl's… that yours was one-thousand two-hundred (1,200)…** |
| 16 | | [Voices overlap] |
| 17 | CASTRO-TORRES | Um-hum. |
| 18 | | [Voices overlap] |
| 19 | UF6684 | **…and that for the little girl it would be six-hundred (600), and for the boy you would just need to pay [U/I]…** |
| 20 | | [Voices overlap] |
| 21 | CASTRO-TORRES | Yes, it's just the taxes because… |
| 22 | | [Voices overlap] |
| 23 | UF6684 | …I think that… she is going to do all of that. |

MEMO. I/S/O GOVT'S MOT. TO DETAIN   12
19-71145 TSH

| | | |
|---|---|---|
| 1 | CASTRO-TORRES | Yeah, she pays for it [U/I]… |
| 2 | | [Voices overlap] |
| 3-4 | UF6684 | [U/I] the names and dates of birth. It's because she, she pays for them, I don't know with, with a card [U/I]. |
| 5-8 | CASTRO-TORRES | Oh, yes, yes. So then, that's good because I was saying that I… that if the papers arrive between now and Wednesday, and I have them… if they can send them overnight, they can overnight them from Seattle… I will get them in the mail… |
| 9 | | [Voices overlap] |
| 10 | UF6684 | Um-hum… |
| 11-14 | CASTRO-TORRES | …and then, and so then, on Thursday, I will go to the office and… because with [U/I] I remember that when [U/I] was there, and it was given the same day, she was there all day, but it was given to her the same day… but they asked her for the [U/I]… |
| 15 | | [Voices overlap] |
| 16 | UF6684 | Oh good… for the ticket? |
| 17 | CASTRO-TORRES | Yes, because she requested it as an emergency. |
| 18 | | [Voices overlap] |
| 19 | UF6684 | So then, what's most important is the ticket? |
| 20 | | [Voices overlap] |
| 21 | CASTRO-TORRES | The ticket, um-hum, yes. |
| 22 | UF6684 | All right, then. I will talk to Ada right now. |
| 23 | CASTRO-TORRES | All right, then, bye. |
| 24 | UF6684 | All right. Oh look, Karen! |
| 25 | CASTRO-TORRES | Um-hum? |

MEMO. I/S/O GOVT'S MOT. TO DETAIN            13
19-71145 TSH

| UF6684 | I am going to send you an account number so that you can give it to Eduardo because I am going to deposit some money that I will be letting him borrow [U/I]. |
|---|---|
|  | [Voices overlap] |
| CASTRO-TORRES | All right, that's fine. |
|  | [Voices overlap] |
| UF6684 | It's Oxidente [PH]. It's Oxidente. |
| CASTRO-TORRES | Um-hum, all right, that's fine [U/I]. |
|  | **[End of call]** |

DEA agents and SFPD officers arrested Karen, Eduardo, and several of their associates later the same day.

### III. DISCUSSION

#### A. Legal Standard

To detain a defendant pending trial, the Court must find by a preponderance of the evidence that there are no conditions that will reasonably assure the defendant's appearance as required, or find by clear and convincing evidence that there are no conditions which reasonably will assure the safety of any person or the community. 18 U.S.C. § 3142(f). In cases such as this, where there is probable cause to believe that the Defendant violated the Controlled Substances Act and faces a maximum of 10 years or more in prison, there is a rebuttable presumption that no condition or combination of conditions reasonably will assure the defendant's appearance as required and the safety of the community. *Id.* § 3142(e)(3)(A). The burden of production then shifts to the defendant. *United States v. Hir*, 517 F.3d 1081, 1086 (9th Cir. 2008) (citing *United States v. Dominguez*, 783 F.2d 702, 707 (7th Cir. 1986)). Although the presumption is rebuttable, it is not a "bursting bubble." *United States v. Jessup*, 757 F.2d 378, 382-83 (1st Cir. 1985) (Breyer, J.). In other words, the presumption is not so weak that whenever the defendant introduces evidence, "the presumption 'bursts' and totally disappears, allowing the judge (or jury) to decide the question without reference to the presumption." *Id.* Since a defendant can "always provide the magistrate with *some* reason ... a 'bursting bubble' approach might render the

presumption virtually meaningless, contrary to Congress's clear intent." *Id.* (emphasis added).

If the Court finds that the defendant has rebutted the statutory presumption of detention, the Court considers four factors in determining whether the pretrial detention standard is met: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence;[3] (3) the defendant's character, physical and mental condition, family and community ties, past conduct, history relating to drug or alcohol abuse, and criminal history, as well as whether the crime was committed while the defendant was on probation or parole; and (4) the nature and seriousness of the danger to any person or to the community that would be posed by the defendant's release. 18 U.S.C. § 3142(g).

From at least early 2018 until her arrest last week, she worked with her significant other and co-conspirator Eduardo Viera-Chirinos ("Eduardo")—the leader of the DTO—

**B.    There is no condition or combination of conditions that can reasonably assure Ms. Castro-Torres's presence as required.**

    **1.    Ms. Castro-Torres has shown that she cannot be trusted to abide by court orders.**

Ms. Castro-Torres has shown that she cannot be trusted to abide by court orders and is not amenable to supervision. Upon entering the United States, she lied to CBP and said she was a minor, when in fact she was already 19 years old. Then Ms. Castro-Torres disappeared, never appearing for any future court dates.

By about two years later, in 2016, Ms. Castro-Torres was already distributing drugs. The arresting officers opined in the police report that, based on their training and experience, the quantity of drugs with which Ms. Castro-Torres was arrested showed that she was not a user or a low-level dealer; she was a mid-level dealer who supplied distribution quantities of drugs to street-level dealers.

Ms. Castro-Torres's actions after that arrest and over the next few years show how she took advantage of every liberty afforded her, absconding at every opportunity. She was arrested in 2016 and 2017 on the drug charges, and both times she failed to appear for any court dates, resulting in bench warrants being issued.

Not only did Ms. Castro-Torres fail to appear, but she also continued to deal drugs. Less than a

---

[3] In the Ninth Circuit, the weight of the evidence is the least important factor.

MEMO. I/S/O GOVT'S MOT. TO DETAIN      15
19-71145 TSH

year after absconding from the 2017 court hearings, Ms. Castro-Torres was arrested based on pounds of methamphetamine, cocaine, and heroin that were found in an apartment she and Eduardo had been using. It was only then that Ms. Castro-Torres was finally held to account for the 2016 charges.

But as soon as she was released from Alameda County Jail, Ms. Castro-Torres did what she always does: She took advantage of the system. Alameda County turned Ms. Castro-Torres over to ICE to be deported; however, because she was pregnant, ICE elected to afford her the courtesy of self-deporting. Given that inch, Ms. Castro-Torres took a mile. She failed to report telephonically to ICE even a single time, and then she failed to board the plane to Honduras, absconding yet again.

Ms. Castro-Torres's actions show that she cannot be trusted to respect the Court's orders.

### 2. Ms. Castro-Torres is motivated to flee to Honduras with her children, and prior to her arrest she was plotting to do so.

In addition to her lack of respect for court orders, Ms. Castro-Torres presents a flight risk because of her strong connections to Honduras, her weak connections to the United States, and the evidence that, prior to her arrest, she and Eduardo were plotting to flee the country.

To begin, Ms. Castro-Torres is unemployed. Indeed, she has no employment history at all, and the intercepted calls in this case provide strong evidence that she was a full-time participant in a drug-trafficking conspiracy.

Ms. Castro-Torres has no viable sureties. Her single proposed surety told Pretrial Services that she is not in the United States legally, that she has no money or property to post, and that she lives in Louisiana, where she would be unable to monitor the defendant's behavior. Given that the surety owns no property, she would be judgment-proof in the event Ms. Castro-Torres violated the terms of her bond. *See* Fed. R. Crim. P. 46(e) ("The court must not approve a bond unless any surety appears to be qualified.").

If released, Ms. Castro-Torres would not return to a stable living situation. She told Pretrial Services that Eduardo paid for her apartment, but given that he also presents a great flight risk and has ordered at least one murder in Honduras, he is likely to be detained as well. Without legal employment to pay for an apartment or a viable custodian, it is not clear where Ms. Castro-Torres would reside while on release.

Ms. Castro-Torres has only weak connections to the United States or this District. She told Pretrial Services that she had one sibling who was in U.S. immigration custody and another half-sibling living in San Francisco. Two of her three children are in Seattle. Ms. Castro-Torres listed no other family members in the United States.

By contrast, Ms. Castro-Torres has strong ties to Honduras. Both of Ms. Castro-Torres's parents live in Honduras, as does her third child. Eduardo's parents live in Honduras, too. And just hours before her arrest, Ms. Castro-Torres plotted with Eduardo and someone in Honduras to obtain passports and plane tickets for the two children who are in Seattle, apparently as part of an attempt to flee the country.

The timing is no coincidence: Just a few days earlier, as set out in the Complaint, authorities had seized from Eduardo a truck containing several large packages of illegal drugs. The intercepted calls show that Eduardo, Ms. Castro-Torres, and their associates were all worried that the authorities would find the truck's secret compartment and then come to arrest them.

On the intercepted call described above, Ms. Castro-Torres explained that she had been wanting to get the passports for a long time and that she had the paperwork ready:

> Look, I already have all the papers, I already filled out the application for the passport. What happened is that I would constantly tell Eduardo . . . and every time, something would happen. If it wasn't one thing, it was another, but it's been a while that I have wanted to get the passport. I already have everything, everything.

Ms. Castro-Torres then said that getting the passports the "normal way" would take too long and that they had better buy a "ticket" (apparently a reference to a plane ticket) so their applications would be given priority due to the impending flight:

> I remember that [another girl] got it that way. That she went there to the office and told them that she needed it quickly, and they asked her why she needed it quickly, and she said, "Oh, it's because I am going to travel." they said, "Look, if you're going to travel, bring the ticket and either the same day or the next day, you will get it...it can be done in a week.

This call shows that the only reason Ms. Castro-Torres was in Court last week is because she was arrested before she could obtain the passports and plane tickets.

MEMO. I/S/O GOVT'S MOT. TO DETAIN                17
19-71145 TSH

### C. There is no condition or combination of conditions that can reasonably ensure the safety of the community.

In addition to a significant risk of flight, Ms. Castro-Torres presents a danger to the community. Ms. Castro-Torres began her time in the United States by lying to authorities about her age, apparently because she thought representing herself to be a minor would result in more favorable treatment.

After absconding from immigration authorities, Ms. Castro-Torres did not obtain a job. Indeed she has no employment history at all. Instead, a mere two years after she entered the United States, Ms. Castro-Torres was arrested for distributing several different types of drugs. And Ms. Castro-Torres was not dealing on the street; she was dealing in even larger quantities, working as a mid-level distributor providing drugs to street-level dealers who distributed it further.

Ms. Castro-Torres's arrest in 2016 did not scare her straight. Instead, she absconded and failed to appear at any court hearings, and she continued to do so after a subsequent arrest. Then, in 2018, she was arrested again. That time, as set out in the Complaint, the evidence showed that Ms. Castro-Torres was working with an even larger quantity of drugs: pound quantities of methamphetamine, heroin, and cocaine.

After that arrest, and even after she was sentenced on the 2016 conviction, Ms. Castro-Torres continued breaking the law. As set out in the Complaint, after her June 2018 arrest, she continued to manage the "redistributor houses" housing street-level dealers employed by the DTO, and she helped ensure that the street-level dealers obtained drugs for further distribution. And she did all of this while still on probation from the 2016 conviction.

Ms. Castro-Torres's prior encounters with law enforcement have not deterred her from continuing to commit crimes, and she has not put forward evidence sufficient to rebut the presumption that no condition or combination of conditions will be sufficient to reasonably ensure the safety of the community if she is released.

## IV. CONCLUSION

Ms. Castro-Torres cannot rebut the presumption of risk of flight and danger to the community. However, even if the Court finds that she has successfully rebutted that presumption, the government has shown by a preponderance of the evidence that no condition or combination of conditions would

reasonably assure her appearance for future court proceedings, because Ms. Castro-Torres has no respect for court orders and a desire to flee to Honduras. The government has also shown by clear and convincing evidence that no conditions or combination of conditions would reasonably assure the safety of the community, because prior arrests have done nothing to stop Ms. Castro-Torres from selling dangerous drugs in this community. Accordingly, the government joins Pretrial Services in requesting that the Court detain Ms. Castro-Torres pending trial.

DATED: August 4, 2019

Respectfully submitted,

DAVID L. ANDERSON
United States Attorney

*/s/ Julie D. Garcia*

JULIE D. GARCIA
RYAN REZAEI
SAILAJA M. PAIDIPATY
Assistant United States Attorneys