ISMAIL J. RAMSEY (CABN 189820)
United States Attorney

THOMAS A. COLTHURST (CABN 99493)
Chief, Criminal Division

SAILAJA M. PAIDIPATY (NYBN 5160007)
DAN M. KARMEL (NYBN 5151485)
Assistant United States Attorneys

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7200
    FAX: (415) 436-7234
    sailaja.paidipaty@usdoj.gov
    dan.karmel@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | NO. 19-0367-06 CRB |
| Plaintiff, | **UNITED STATES' SENTENCING MEMORANDUM** |
| v. | |
| KAREN CASTRO-TORRES, | Judge: Hon. Charles R. Breyer<br>Sentencing Date: April 26, 2023<br>Time: 10:30 a.m. |
| Defendant. | |

## I. INTRODUCTION

Nearly three years after absconding while on pretrial release, Defendant Karen Castro-Torres must finally face the consequences for her role in managing a multi-state drug trafficking organization and for lying to this Court when she pledged to abide by the terms of her bond. Castro-Torres served as a lieutenant in the drug trafficking organization (DTO) led by her partner, Eduardo Viera-Chirinos. In that position, she sourced and rented apartments in the East Bay for the organization's large number of street-level dealers. This housing superstructure was integral to the organization's ability to recruit and

UNITED STATES' SENTENCING MEMO.
NO. 19-0367-06 CRB

1

retain dealers, who served as the DTO's engine on the streets of the Tenderloin neighborhood in San Francisco. Unlike the lower-level dealers, Castro-Torres had a relatively clean criminal record and the capital for security deposits, both of which enabled her to procure East Bay housing more easily.

Like her actions in this case, Castro-Torres's minimal criminal history was built on a series of lies to courts and law enforcement. On at least three occasions between 2014 and 2018, she was released on bond conditions by immigration officials and in state criminal cases. Each time, Castro-Torres willfully failed to appear again for hearings. She only ever came when she was re-arrested.

Following her arrest in this case, that pattern continued. As this Court knows, after numerous contested hearings and after pledging to two federal judges that she would abide by bond conditions, Castro-Torres was released to a halfway house. But she once more proved untrustworthy, fleeing from the halfway house in July 2020 and returning to Honduras. Over two years later, Castro-Torres came back to the United States. She returned to the area she knew best – the streets of the Tenderloin. Phone data shows that night after night she was back in the Tenderloin, within blocks of the federal building. She didn't try to turn herself in, but once more believed she could act with impunity.

Despite her words, Castro-Torres's actions have demonstrated who she is time and time again – a drug dealer undeterred by arrests. For nearly a decade, she has avoided meaningful consequences for her continued criminal conduct. A significant sentence is necessary to finally hold her accountable. The government recommends the imposition of a 121-month sentence followed by four years of supervised release. This recommendation, which adopts a five-level downward variance from the U.S. Sentencing Guidelines range calculated by the U.S. Probation Office ("Probation"), appropriately accounts for mitigating factors, as required by the statutory sentencing factors, and this Court should not consider a further variance.

## II.     PROCEDURAL POSTURE

Officers and agents arrested Castro-Torres on July 26, 2019, following the issuance of a federal criminal Complaint. *See* Dkt. 1. On August 8, 2019, a grand jury returned an Indictment charging Castro-Torres (and 13 co-defendants) with conspiracy to traffic drugs, in violation of 21 U.S.C. §§ 846, 841(a)(1), (b)(1)(B). Dkt. 51.

On May 7, 2020, Castro-Torres was released to reside at a halfway house. Presentence Investigation Report ("PSR") ¶ 10. Almost two months later, on July 3, 2020, Castro-Torres left the halfway house and never returned. *Id.* As described in greater detail below, Castro-Torres returned to Honduras for some period of time between mid-2020 and her arrest last year. She was rearrested in San Francisco in June 2022 and entered an open guilty plea on September 21, 2022. *Id.* ¶ 8.

### III.   SENTENCING GUIDELINES CALCULATIONS

The government agrees with the U.S. Sentencing Guidelines calculation determined by Probation finding the following:

|   |   |   |   |
|---|---|---|---|
| a. | Base Offense Level, U.S.S.G. §§ 2D1.1(a)(5), (c)(4): <br>(At least 3,000 KG but less than 10,000 KG of Converted Drug Weight) | | 32 |
| b. | Defendant was a Manager or Supervisor (U.S.S.G. § 3B1.1(b)) | | +3 |
| c. | Obstruction of Justice (U.S.S.G. § 3C1.1) | | +2 |
| d. | Acceptance of Responsibility (U.S.S.G. § 3E1.1(a)): | | - 2 |

The final offense level is 35, at a Criminal History Category III, resulting in an advisory Guidelines range of 210-262 months.

### A.   Castro-Torres was a manager/supervisor within the drug trafficking organization.

The government agrees with Probation's assessment that Castro-Torres was a "manager or supervisor" as defined by § 3B1.1(b) of the U.S. Sentencing Guidelines, resulting in a three-point Guidelines enhancement. Probation did not find, and the government is not arguing, that a four-point enhancement for being an "organizer or leader" is appropriate under § 3B1.1(a). There is no doubt that Eduardo[1] led the organization and indeed numerous intercepted calls support this. But as intercepted calls further revealed, Castro-Torres served as Eduardo's first lieutenant and was empowered to act on her own accord with respect to certain aspects of the organization.

In differentiating between the two roles, Application Note Four to § 3B1.1 lists a series of factors for a sentencing court to consider, including the following: (i) the exercise of decision making authority,

---

[1] Because several co-defendants in this case share the same last name, the government will refer to some individuals by their first names to avoid confusion.

3

UNITED STATES' SENTENCING MEMO.
NO. 19-0367-06 CRB

(ii) the nature of participation in the commission of the offense, (iii) the recruitment of accomplices, (iv) the right to a greater share of the enterprise's fruits; (v) the degree of the defendant's participation in planning/organizing the offense; (vi) the nature and scope of the illegal activity; and (vii) the degree of control/authority exercised over others.  Here, Castro-Torres made decisions on the organization's behalf with respect to drug pricing and supply; directed lower-level managers on the drugs to provide to street-level dealers; and maintained the housing infrastructure for the organization, which was key to the DTO's recruitment and scope.  Taken together, her role was one of a high-level manager with far greater authority than co-defendants in this case.

### 1. Castro-Torres directed the organization's lower-level managers regarding supplying street-level dealers with narcotics.

As the Court knows from prior sentencings in this case and related cases, the charges here stem from a federal wiretap investigation described in detail in the Criminal Complaint.  *See* Dkt. 1 (originally filed under 3:19-mj-71145 TSH).)  The investigation uncovered an organized drug network where Eduardo, Castro-Torres, and others housed street-level dealers in houses and apartments in the East Bay.  *See* Dkt. 1, Compl. ¶¶ 59-139.  On a near daily basis, the street-level dealers placed orders for drugs that were dropped off to them by Enrique Viera-Chirinos, Eduardo's nephew, and Cilder Velasquez, Castro-Torres's cousin.  *Id.*

Intercepted calls reveal that Castro-Torres instructed Cilder and Enrique on the quantity of drugs to provide to street-level dealers and the price point for those drugs.[2]  On several calls, Cilder told street-level dealers that Karen directed him to drop off drugs to that individual.  For example, on May 24, 2019, Cilder spoke with an unknown male using a telephone number ending in 2281 (UM-2281).  Declaration of Sailaja M. Paidipaty ("Paidipaty Decl.") (filed concurrently with this briefing), Exhibit A, Target Telephone 7 Line Sheets, Call 79.  Cilder informed the man that Castro-Torres had told him to go to UM-2281's location.  UM-2281 then asked if Cilder would bring "a whole one," Cilder confirmed,

---

[2] All of the intercepted calls described in this memorandum occurred in Spanish.  Bilingual monitors created English summaries of the calls.  The government is relying on these translated summaries for its understanding of the substance of the calls.  Both the original Spanish language recordings and the English summaries have been produced in discovery.

4
UNITED STATES' SENTENCING MEMO.
NO. 19-0367-06 CRB

"whole." As described in the Complaint, through the investigation agents learned that the organization referred to drugs using coded language and a "whole" meant one full unit of a drug – e.g. one pound or one ounce depending on the dealer's typical order. Dkt. 1 ¶ 55.

The following day, Castro-Torres called Cilder and told him that one of the street-level dealers, "Pica" (co-defendant Luis Almicar), would be asking for half a unit of "black." Paidipaty Decl., Exhibit B, Target Telephone 8 Line Sheets, Call 65. Investigators learned that "black" was a term used by the organization to refer to heroin because of its dark color. Dkt. 1 ¶ 32. Understanding that Castro-Torres was providing directions to deliver a half unit of heroin to Almicar, Cilder responded that he would "head back to that area" – meaning he would go over to where Almicar lived – "soon." *Id*.

The following week, Cilder and Almicar called Castro-Torres together. During the call, Almicar told Castro-Torres that he owed "half" to Castro-Torres (likely referencing the half unit of heroin that Cilder delivered the prior week) and that he intended to pay for that and wanted to get another one. *Id.* at Call 192. Agents understand that typically drug suppliers provide drugs on consignment to street-level dealers. Those dealers then sell the narcotics and repay their supplier. Here, agents believe Almicar was indicating that he still owed Castro-Torres for the last drug supply but wanted to receive another unit of drugs for sale. Of note, the person that Almicar was indebted to was Castro-Torres, not Cilder. Because while Cilder was the boots on the ground delivering the drugs, he was acting at Castro-Torres's instruction and the money ultimately was owed to her as a higher-level manager of the organization.

This pattern repeated over and over across months of intercepted calls. Castro-Torres instructed others on how to deliver drugs and had the authority to determine whether a street-level dealer could receive more drugs on consignment even if they already owed money to the organization.

Further, in order to provide directions to Cilder and others, Castro-Torres possessed an understanding of the organization's drug supply at any given time. In fact, when authorities searched a home affiliated with the organization in 2018, they found Castro-Torres's name on a pay/owe sheet next to a reference to Eduardo. PSR ¶ 25. Agents found over two gross kilograms of drugs and approximately $73,000 in cash hidden within an air compressor. *Id.* On top of the drugs and cash was a

piece of paper towel with the names "Rojo" and "Karen" written on it. *Id.* Through the investigation, agents know that "Rojo" is a common nickname for Eduardo and "Karen" references Castro-Torres. Dkt. 1 ¶ 30. A low-level manager in an organization would not have access to such a large quantity of narcotics or cash. That Castro-Torres was referenced alongside Eduardo reflects her stature in the DTO and her access to drug supplies and money.

In another call, Castro-Torres asked Cilder "what he had left," meaning what quantity of drugs he had left to give to the street-level dealers. Cilder said "21 of the white kind" (cocaine). Cilder asked if Castro-Torres was taking note of what he had and if she would like him to provide a list. Castro-Torres asked Cilder to "count the money" and told him to give some of the money to Victor (Eduardo's brother) so Victor could "buy 3," and to "put the rest aside." Here, Cilder showed Castro-Torres deference in offering to provide a list of the drugs he had at the time and Castro-Torres directed Cilder on how to use the organization's money – specifically, to give some money to Victor who would purchase more drugs. Paidipaty Decl., Exhibit C, Target Telephone 15 Line Sheets, Call 12.

### 2. **Castro-Torres oversaw the organization's housing infrastructure and had discretion to spend the DTO's money to maintain these residences.**

The East Bay housing network for street-level dealers allowed the Viera-Chirinos DTO to flourish. Castro-Torres was pivotal setting up and managing that housing. She communicated with potential landlords, viewed housing options, completed rental paperwork, and submitted security deposits. *See* Paidipaty Decl., Exhibit C, Target Telephone 15 Line Sheets at Call 74 (Castro-Torres speaking with a woman about available apartments for rent); Call 263 (Castro-Torres inquiring about a "house for rent" for "3 or 4 people"); Calls 267-268.

This was of particular value to the scope of the organization as most of the street-level dealers faced difficulty finding housing on their own because of their criminal history and immigration status. When Castro-Torres was looking for a house for Almicar and other dealers, she asked if anyone had a "clean ID" so the apartment could be put in the name of someone who "had not been burned already," meaning someone who hadn't been caught by law enforcement. *Id.* at Call 273. In addition, the organization, through Castro-Torres, paid security deposits for these locations, which provided another

benefit to street-level dealers. When a landlord indicated that the security deposit would not be returned for one of the apartments, Castro-Torres required the dealer to pay her one month's worth of rent as compensation. *See id.* at Call 226. She told Cilder that she would then use that money to pay the security deposit for another set of dealers.

The housing system allowed the organization to recruit street-level dealers and maintain loyalty. When dealers for another organization had their house searched by law enforcement, they contacted Enrique to see if they could join the Viera-Chirinos DTO. *See United States v. Andy Reanos-Moreno*, No. CR 19-00381 CRB (originally filed as 3:19-mj-71162 TSH), Dkt. 1 ¶¶ 251-257. The dealers specifically asked for a house for five people. *Id.* ¶ 254. Castro-Torres and Enrique then got on the phone with one of those dealers to discuss a potential arrangement. Paidipaty Decl., Exhibit D, Target Telephone 12 Line Sheets, Call 847. Castro-Torres asked how many rooms the dealers needed and when they needed a new residence. The individual and Castro-Torres went on to discuss drug pricing for "white" (cocaine), "black" (heroin), and "crack." *Id.* As demonstrated by Enrique's deference to Castro-Torres during this call, Castro-Torres made the primary decisions regarding the organization's housing and her ability to manage that system brought potential new drug dealers to the DTO.

The evidence amply demonstrates that Castro-Torres held significant power within the organization and the three-level enhancement for being a "manager" or "supervisor" applies.

**B.   Castro-Torres's criminal history is not overrepresented.**

Although the PSR suggests that Castro-Torres's criminal history may be overrepresented, PSR ¶ 109, Criminal History Category III is a proper reflection of her criminal history. The four points included in Castro-Torres's criminal history score arise from (1) a 6-month jail sentence she received in 2018 for a felony narcotics conviction and (2) the fact that she committed the offense of conviction in this case while still under a criminal justice sentence for that offense. *Id.* ¶¶ 58, 60. This is precisely the type of conduct that the criminal history category score is intended to account for. *See* U.S.S.G., Chapter Four, Introductory Commentary ("A defendant with a record of prior criminal behavior is more culpable than a first offender . . . . General deterrence of criminal conduct dictates that a clear message be sent to society that repeated criminal behavior will aggravate the need for punishment with each

occurrence.").

If anything, Castro-Torres's criminal history score fails to account for the full scope of her history of unlawful conduct. Castro-Torres entered the United States without authorization in approximately 2014. On August 30, 2014, U.S. Customs and Border Protection apprehended her near the U.S./Mexico border. At the time, she told law enforcement that she was born on February 25, 1998, and that she was therefore 16 years old. As a result, Castro-Torres was treated as an unaccompanied minor, served with a notice to appear, and released to a family member in the Los Angeles area. *See* PSR ¶ 60.

Following her release, Castro-Torres never appeared in court. *Id.* On February 12, 2015, she was ordered removed in absentia; records checks showed that she was not in custody at the time. Slightly over a year later, in May 2016, Castro-Torres was arrested for possession of narcotics with the intent to distribute. *Id.* ¶ 58. Castro-Torres again failed to appear to face these charges, and a bench warrant was issued. *Id.*

On August 13, 2017, Castro-Torres was arrested on the bench warrant in Santa Clara County. She spent four days in jail before being released on bail. Court documents show that Castro-Torres then missed the next three court dates, and a bench warrant was issued again. On June 5, 2018, Castro-Torres was arrested in connection with this case. Upon her arrest, Castro-Torres was brought before the Alameda County Superior Court to face the charges arising from the 2016 arrest (when she had had drugs in her purse). Castro-Torres entered a no-contest plea and was sentenced to six months in jail and three years' probation. *Id.*

Castro-Torres was released from the Alameda County jail into the custody of Immigration and Customs Enforcement (ICE) in connection with the deportation order that had been issued in 2015. The officers asked whether Castro-Torres had any medical issues, and she said she was six months pregnant. According to ICE Agent Jeff Castro, due to the pregnancy ICE did not immediately deport Castro-Torres; rather, ICE released her on the condition that she self-deport within one week and, in the interim, be subject to telephonic monitoring. Castro-Torres never called ICE as required. Eventually, her relative "Ana" called ICE and said that Castro-Torres had purchased a ticket to Honduras for September

7th. ICE agents went to the airport to confirm that Castro-Torres boarded the plane; however, she never appeared.

Castro-Torres was still on state probation when, on July 26, 2019, she was arrested on the current charges. When Castro-Torres appeared in this Court for her arraignment, she stated that she was 24, consistent with the birthdate she provided to Pretrial Services. Based on that age and birthdate, Castro-Torres was 19 years old when she crossed the border into the United States in 2014—not a minor, as she had represented to Customs and Border Protection.

Following her arrest and release to a halfway house, Castro-Torres absconded from pretrial release in violation of 18 U.S.C. § 3146 and thereafter likely reentered the United States in violation of 8 U.S.C. § 1325.[3] This was a continuation of a history of disregarding the laws and exploiting the leniency of the United States justice system, which is accurately reflected in her criminal history category.

### C. An additional one-point decrease for acceptance of responsibility is not warranted in light of Castro-Torres's two years on the lam and her failure to surrender to authorities following her return to the District in 2022.

As set forth in the PSR, Castro-Torres's abscondment from pretrial release and failure to appear result in the addition of an obstruction of justice enhancement under U.S.S.G. § 3C1.1. *See generally United States v. Rosas*, 615 F.3d 1058, 1065 (9th Cir. 2010) ("Here, the Guidelines allow for failure to appear to provide the basis for two enhancements, obstruction of justice and commission of an offense while on release."). Accordingly, unless the Court deems this an "extraordinary" case, the acceptance of responsibility adjustment under U.S.S.G. § 3E1.1 should not be applied. *See* Application Note 4 to U.S.S.G. § 3E1.1.

This case does not qualify for that narrow exception. "Extraordinary" cases are those in which a defendant's obstruction was "not inconsistent" with acceptance of responsibility. *United States v.*

---

[3] Because there was an active warrant out for Castro-Torres's arrest, for her to come into the United States from Honduras she likely would have had to enter through an illegal point of entry, elude examination or inspection by immigration officers, and/or use a false name or identification. Had Castro-Torres self-deported in 2018 as she had agreed to do, her illegal reentry into the United States from Honduras would have been a felony violation of 8 U.S.C. § 1326, as opposed to a misdemeanor violation of 8 U.S.C. § 1325.

*Hopper*, 27 F.3d 378, 383 (9th Cir. 1994). "Cases in which obstruction is not inconsistent with an acceptance of responsibility arise when a defendant, although initially attempting to conceal the crime, eventually accepts responsibility for the crime and abandons all attempts to obstruct justice." *Id*. Castro-Torres took no such steps to accept responsibility and abandon her obstruction of justice. She fled to Honduras, lived there for years, and then returned illegally. Once she returned, she made no effort to contact Probation or otherwise accept responsibility for her actions. Instead, she spent numerous nights in a row in the Tenderloin during overnight hours. The government knows this because of the resources it had to expend locating Castro-Torres, including getting warrants for her Facebook account and cell phone—the same cell phone she easily could have used to contact Probation if she required assistance or wanted to abandon her obstruction of justice.[4] The government, however, acknowledges that Castro-Torres ultimately pleaded guilty and does not object to the two-level reduction for acceptance of responsibility in this case. But the government is not moving for the additional third level reduction, under § 3E1.1(b), given Castro-Torres's egregious conduct and the resources expended to locate and arrest her.

## IV.   GOVERNMENT'S SENTENCING RECOMMENDATION

The Court should impose a sentence sufficient, but not greater than necessary, to reflect the purposes of sentencing that Congress identified in 18 U.S.C. § 3553(a)(2). *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008). The Court should begin by calculating the correct sentencing range under the Sentencing Guidelines. *Id.* The Guidelines are "the 'starting point and the initial benchmark,'" *United States v. Ellis*, 641 F.3d 411, 415 (9th Cir. 2011) (quoting *United States v. Kimbrough*, 552 U.S. 85, 108 (2007)), and the Court should "remain cognizant of them throughout the sentencing process." *United States v. Gall*, 552 U.S. 38, 50 n.6 (2007). After determining the appropriate Guidelines

---

[4] Courts have rejected arguments that situations such as Castro-Torres's constitute an "extraordinary case." *See, e.g.*, *United States v. Rosas*, 615 F.3d 1058, 1067 (9th Cir. 2010) ("Rosas attempted to show that he left for Mexico because his grandfather was ill and was calling for Rosas, the only one capable of managing the family ranch. These facts, while not irrelevant, do not change the fact that his flight was voluntary and that he had not accepted the responsibility for, and consequences of, his actions."); *United States v. Thompson*, 80 F.3d 368, 371 (9th Cir. 1996) ("While her timely entry of a plea agreement and her statement at sentencing are strong evidence of her acceptance of responsibility, they are not so strong as to outweigh the fact that she absconded before sentencing.").

calculations, the Court should then evaluate the sentence for substantive reasonableness in light of the factors set out in Section 3553(a). *Carty*, 520 F.3d at 991-93. Here, the most important considerations are the nature and circumstances of the offense, the history and characteristics of the defendant, and the need to afford adequate deterrence. 18 U.S.C. § 3553(a)(1), (a)(2)(B).

The government recognizes that the advisory Guidelines range in this case is high because of the significant quantities of drugs found in Castro-Torres's apartment and because of the enhancements for the defendant's role in the organization and flight from the country. These increases reflect Castro-Torres's actions and should be accounted for in her sentence. However, a seventeen-and-a-half-year period of incarceration, as prescribed by the Guidelines, is unnecessary to achieve the statutory sentencing factors. Castro-Torres has not spent considerable time in prison and the 121-month sentence recommended by the government will promote both specific and general deterrence and will appropriately punish the defendant's extensive criminal conduct. A lower sentence is unwarranted and this Court should reject such an invitation.

Castro-Torres has been convicted of a serious crime. From at least early 2018 until July 2019, she was a lieutenant of a DTO that distributed pound and kilogram quantities of methamphetamine, heroin, and cocaine in the San Francisco Bay area and Seattle. In this role, she had significant managerial responsibilities, including instructing other members of the DTO on the quantities and prices of drugs to provide to street-level dealers. Moreover, by managing housing for low-level dealers, Castro-Torres created the infrastructure that allowed the organization to thrive and distribute kilograms worth of drugs.

But the seriousness of Castro-Torres's criminal conduct in this case is not the whole story. Instead, it was the continuation of a long history of brazen disregard for the law, and it continued thereafter with Castro-Torres's abscondment and violation of the terms of her release. *See generally* 18 U.S.C. § 3553(a)(1) (at sentencing, a court shall consider, *inter* alia, "the nature and circumstances of the offense and the history and characteristics of the defendant"). Castro-Torres pledged that she would abide by conditions of release and had no intention of fleeing the jurisdiction. Yet, only two months after being released to 111 Taylor Street, Castro-Torres absconded, ultimately returning to Honduras.

Agents located a Facebook account and received a search warrant for its contents. Internet Service Provider (ISP) addresses revealed that the account was being accessed from Honduras. In 2022, when agents learned that Castro-Torres likely returned to the United States, they received a warrant to track data associated with her suspected phone number. The data indicated that Castro-Torres was in the Tenderloin half a dozen times in the overnight hours prior to her arrest on June 22, 2022. Paidipaty Decl., Exhibit E, DEA Report. She came within blocks of the federal building after violating her promises to the Court.

This Court has sentenced nearly two dozen drug dealers in this case as well as the related cases, but most of those individuals were street-level traffickers. To date, no one at Castro-Torres's level within these organizations has been sentenced (Jorge Viera-Chirinos and Victor Viera-Chirinos who were also at a higher levels in the DTO than the average street level dealer absconded while on pretrial release).

Other sentencings, however, are instructive in guiding this Court's assessment of relative culpability. In this case, Cilder, a lower-level manager who took orders from Castro-Torres, received a four-year sentence. Dkt. 409. Enrique, another lower-level manager who reported to Castro-Torres, received a five-year sentence (a mandatory minimum applied because Enrique did not satisfy the requirements for relief under the federal safety valve). Dkt. 349. Any sentence imposed on Castro-Torres should be longer as she had authority over these individuals and, as evidenced by the calls described earlier, had greater control over the organization's money and drug supply.

All of the foregoing counsels in favor of imposition of a significant custodial sentence. A significant sentence is warranted and necessary to hold Castro-Torres accountable for her conduct, both leading up to and following her arrest in this case.

## V.   CONCLUSION

The government respectfully recommends that this Court impose a 121-month custodial sentence, followed by four years of supervised release, and a $100 mandatory special assessment.

DATED: April 19, 2023                                          Respectfully submitted,

ISMAIL J. RAMSEY
United States Attorney

            /s
SAILAJA M. PAIDIPATY
DAN M. KARMEL
Assistant United States Attorneys

UNITED STATES' SENTENCING MEMO.
NO. 19-0367-06 CRB

13